UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**345 PROPERTY OWNER, LLC,**

    Plaintiff,

  v.                                                  Case No. 18-CV-1476

**UNITED STATES POSTAL SERVICE,**

    **Defendant.**

---

### DECISION AND ORDER ON DEFENDANT'S MOTION TO DISMISS

---

345 Property Owner, LLC ("the Owner") filed an Amended Complaint against the United States Postal Service ("USPS") alleging breach of USPS's lease of the Owner's property at 345 West St. Paul Avenue in Milwaukee, Wisconsin ("the Property").[1] (Docket # 26.) USPS moves to dismiss the Amended Complaint on the grounds that it fails to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons that follow, USPS's motion to dismiss will be granted.

### BACKGROUND

The Owner alleges that USPS entered into a lease for the Property effective April 1, 1970. (*Id.* ¶ 5.) The original lease term expired in 2000, but the lease granted USPS eight successive five-year renewal options and is still in force. (Docket # 26-1 at 1; Docket # 26 ¶¶ 6–7.) The Owner alleges that, pursuant to the terms of the lease, USPS is obligated to maintain the Property. (*Id.* ¶ 8.) Section 7(a) of the lease states as follows:

> The Government shall, unless herein specified to the contrary, keep the [ ] premises in good repair and tenantable condition, except that the

---
[1] For simplicity, I refer throughout to the parties to the lease and to this lawsuit as "the Owner" and "USPS." Neither 345 Property Owner nor USPS was an original party to the lease, which was signed by Olaf and Eleanore Knudsen and the United States Post Office Department, and which refers to "the Lessor" and "the Government." (Docket # 26-1.)

> Government shall not be obligated to repair the [ ] premises in the event of total or partial damage thereto or destruction thereof caused by fire or other casualty or calamity, Acts of God, acts of the public enemy, or acts of a stranger, the repair of which said damage or destruction shall remain the obligation of the Lessor. . . . The term "repair" as used in this subparagraph includes repairs of every character, exterior and interior, structural and nonstructural, ordinary as well as extraordinary, foreseen as well as unforeseen, replacements and renewals. . . . The Government's responsibilities as stated herein shall be fulfilled at such time and in such manner as it considers necessary to keep the demised premises, equipment, fixtures, improvements and appurtenances in proper condition.

(Docket # 26-1 at 2.) The lease also contains the following clause:

> Prior to expiration or termination of this Lease the Government shall, if required by the Lessor by notice in writing sixty days in advance of such termination, restore the premises to as good condition as that existing at the time of entering upon the same under this Lease, reasonable wear and tear and damages by the elements or by circumstances over which the Government has no control, excepted.

(*Id.* at 3 ¶ 9.)

On or about September 13, 2017, USPS' agent, EMCOR, sent the Owner a letter identifying deficiencies in the Property as follows: "There is grass, mold, plants, bird droppings and debris all over the roof. There are a couple roof leaks on the north side. Need roof maintenance and repairs." (*Id.* ¶ 11.) The letter requested that the Owner "have this work completed no later than 10/13/2017." (*Id.* ¶ 12.) The Owner contacted EMCOR to inform EMCOR that all maintenance and repair obligations remained with USPS, not the Owner. (*Id.* ¶ 15.) EMCOR acknowledged this fact. (*Id.* ¶ 16.) However, nothing happened to remediate the issues raised. (*Id.* ¶ 17.)

On March 9, 2018, a representative from the Owner toured the Property. (*Id.* ¶ 18.) On or about April 16, 2018, the Owner sent USPS a letter detailing the issues visually observed and requesting action to address them. (*Id.* ¶ 19.) The issues included the following: the north roof was covered in moss, plants, birds, and bird droppings; safety netting was installed under various ceilings; epoxy coating on the second floor was worn

away, allowing water to infiltrate the concrete slab on the second floor drive floor and permitting dripping to the floors below; and the east ramp displayed signs of concrete deterioration. (*Id.* ¶ 20.) USPS did not respond to the April letter. (*Id.* ¶ 21.) The Owner also expressed concerns about alleged structural deficiencies in the seawall. (*Id.* ¶ 22.)

On or about July 10, 2018, the Owner sent a notice of default to USPS pursuant to Wis. Stat. §§ 704.17(3) and 704.21(1)(3), providing a deadline of August 15, 2018 to remediate the issues. (*Id.* ¶ 23.) On July 11, 2018, a representative of USPS replied via email that USPS was looking into remedying the issues. (*Id.* ¶ 24.) On March 19, 2019, USPS allowed the Owner's engineers to inspect the premises. (*Id.* ¶ 30.) The engineers observed structural damage to the seawall. (*Id.* ¶ 31.) On March 21, 2019, USPS produced an investigation report relating to the seawall dated February 14, 2019. (*Id.* ¶ 32.) The Owner alleges that the structural integrity of the seawall is compromised and requires further inspection and immediate repair. (*Id.* ¶ 36.)

## STANDARD OF REVIEW

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) challenges the sufficiency of the complaint on the basis that the plaintiff has failed to state a claim upon which relief can be granted. A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has interpreted this language to require that the plaintiff plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In *Ashcroft v. Iqbal*, the Supreme Court elaborated further on the pleadings standard, explaining that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," though this "standard is not akin to a 'probability requirement.'" 556 U.S. 662, 678 (2009).

The allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (internal citation omitted).

When determining the sufficiency of a complaint, the court should engage in a two-part analysis. *See McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011). First, the court must "accept the well-pleaded facts in the complaint as true" while separating out "legal conclusions and conclusory allegations merely reciting the elements of the claim." *Id.* (citing *Iqbal*, 556 U.S. at 680). Next, "[a]fter excising the allegations not entitled to the presumption [of truth], [the court must] determine whether the remaining factual allegations 'plausibly suggest an entitlement to relief.'" *Id.* (citing *Iqbal*, 556 U.S. at 681). As explained in *Iqbal*, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." 556 U.S. at 679. All factual allegations and any reasonable inferences must be construed in the light most favorable to the nonmoving party. *Price v. Bd. of Educ. of City of Chicago*, 755 F.3d 605, 607 (7th Cir. 2014).

## APPLICABLE LAW

Although federal law governs obligations to and rights of the United States under its contracts, federal courts may look to state law to supply the rules of decision where federal law is silent. *Powers v. U.S. Postal Service*, 671 F.2d 1041, 1043 (7th Cir. 1982) (citing *United States v. Fox*, 94 U.S. 315, 320 (1877)). As there is no federal common law of landlord and tenant, the Seventh Circuit has elected to apply state law to disputes under postal service leases. *Powers*, 671 F.2d at 1042–46; *cf. U.S. Postal Service v. Ester*, 836 F.3d 1189, 1195 (9th Cir. 2016) (applying state law to postal service lease). Under *Powers*, Wisconsin supplies the rules for resolving this dispute. However, because Wisconsin law is in harmony with general

4

principles of contract interpretation and the common law of landlord and tenant on the relevant points, as shown below, little turns on this distinction.

## ANALYSIS

The heart of the Owner's complaint is that USPS breached its lease with the Owner by failing to keep the Property "in good repair and tenantable condition" as required by Section 7(a) of the lease. Count One seeks eviction under Wisconsin law. (Docket # 26 ¶¶ 37–45.) Count Two seeks monetary damages for an unlawful taking. (*Id.* ¶¶ 46–59.) Count Three seeks monetary damages for breach of contract. (*Id.* ¶¶ 60–67.) Count Four seeks monetary damages for breach of the implied covenant of good faith and fair dealing. (*Id.* ¶¶ 68–72.) Count Five seeks a declaratory judgment. (*Id.* ¶¶ 73–76.) However, the Amended Complaint fails to state a claim on any of these counts.

### 1. *Counts One, Two, and Three: Breach of the Lease*

The first three counts rely on the Owner's claim that USPS breached the lease by failing to keep the Property in "good repair and tenantable condition" as required by Section 7(a) of the lease. (*Id.* ¶¶ 38, 48, 63.) To support this claim, the Owner alleges that USPS failed to remedy the following "maintenance deficiencies":

a. the North roof was covered in moss, plants, birds, and bird droppings;
b. safety netting was installed under all exterior concrete coffered ceilings on the first floor;
c. safety netting was installed under the entire maintenance shop ceiling;
d. epoxy coating on the second floor was worn away, which allowed water to infiltrate the concrete slab on the second floor drive floor and permitted dripping to the floors below;
e. and the East ramp displayed obvious signs of concrete deterioration.

(*Id.* ¶ 20.) The Owner also alleges that there are structural deficiencies in the seawall due to failure to maintain it. (*Id.* ¶ 22.)

USPS argues that the Owner has not pleaded a plausible claim for breach of the lease. USPS argues that the Owner misinterprets USPS's maintenance obligations under the

5

lease and that the deficiencies alleged cannot constitute a breach of the lease, and therefore these three counts must be dismissed. (Docket # 27-1 at 9, 14–15, 15–21.)

A claim for breach of contract requires a contractual duty, a breach of that duty, and damages flowing from that breach. *Matthews v. Wisconsin Energy Corp., Inc.*, 534 F.3d 547, 553 (7th Cir. 2008) (citing *Northwestern Motor Car, Inc. v. Pope*, 51 Wis. 2d 292, 296, 187 N.W.2d 200 (Wis. 1971)). The threshold question for this motion is whether and to what extent the lease imposes on USPS a duty to maintain and repair the Property. I then turn to whether the Owner has stated a plausible claim for breach of that duty.

### 1.1 USPS's Duty to Maintain the Premises

#### 1.1.1 Interpreting Maintenance and Repair Provisions

When interpreting a contract, the primary goal is to "'give effect to the parties' intent, as expressed in the contractual language.'" *Maryland Arms Ltd. Partnership v. Connell*, 2010 WI 64, ¶ 22, 326 Wis. 2d 300, 786 N.W.2d 15 (citing *Seitzinger v. Cmty. Health Network*, 2004 WI 28, ¶ 22, 270 Wis. 2d 1, 676 N.W.2d 426). The language of a contract is interpreted "consistent with what a reasonable person would understand the words to mean under the circumstances." *Id.* "Where the terms of a contract are clear and unambiguous, we construe the contract according to its literal terms." *Id.* at ¶ 23 (citing *Gorton v. Hostak, Henzl & Bichler, S.C.*, 217 Wis. 2d 493, 506, 577 N.W.2d 617 (1998)). Contract provisions are not to be construed in isolation; rather, "the meaning of particular provisions in the contract is to be ascertained with reference to the contract as a whole." *Tempelis v. Aetna Cas. and Sur. Co.*, 169 Wis. 2d 1, 9, 485 N.W.2d 217 (Wis. 1992); *see also Maryland Arms*, 2010 WI 64 at ¶ 25 (analyzing sentence in context of paragraph as a whole to determine parties' intent).

In keeping with the general principle that contract clauses are to be construed in context and not in isolation, where a commercial lease contains both (1) a covenant to

repair and maintain the premises and (2) a clause requiring that the premises be surrendered in a particular condition at the end of the lease, the two must be construed together. *Brooklyn Waterfront Terminal Corp v. United States*, 90 F. Supp. 943, 947–51 (Ct. Cl. 1950); *Lindsay Bros., Inc. v. Milwaukee Cold Storage Co.*, 58 Wis. 2d 658, 665, 207 N.W.2d 639 (Wis. 1973) (collecting cases); *see generally* Milton R. Friedman & Patrick A. Randolph, Jr., Friedman on Leases § 10.6.1 (5th ed.) ("When a repair clause and a surrender clause . . . are present in a lease, the repair clause cannot be considered alone. Both clauses are to be read together and construed together."). Courts have emphasized that the maintenance and repair obligation during the lease period cannot exceed the obligation to restore the property at the end of the lease term; if the surrender clause contains an exception for reasonable wear and tear, the maintenance and repair clause is also construed to contain such an exception.

For example, in *Brooklyn Waterfront Terminal*, the Court of Claims examined language materially identical to that in this lease, with obligations on the government lessee to (1) keep the premises "in good repair and tenantable condition" and (2) if required by the lessor, restore the property prior to termination of the lease, "reasonable and ordinary wear and tear and damages by the elements or by circumstances over which the Government has no control excepted." 90 F. Supp. at 944. Applying general principles of contract and landlord/tenant law, the court refused to construe the covenant to keep the premises "in good repair and tenantable condition" in isolation to impose an "absolute" covenant to repair, as that would have the unacceptable result of making the defendant "the insurer of the plaintiff's premises." 90 F. Supp. at 948. Instead, the court construed the two clauses together as excepting ordinary wear and tear from the maintenance and repair obligation also. *Id.* at 948–50. The court concluded that the covenant to keep the premises "in good repair and tenantable condition" was merely a restatement of the common law obligation to

7

keep the premises in such a condition that they could be used "*for the purpose for which leased*," nothing more. 90 F. Supp. at 950 (emphasis added).

More recently and closer to home, the Wisconsin Supreme Court in *Lindsay Bros.* held that a provision in a commercial lease making the lessee responsible for "usual and necessary repairs" did not require the lessee to repair portions of a warehouse that had fallen into disrepair due to age and normal use. The court explained that repair clauses of this type in commercial leases are "properly construed to impose only a minimal duty on the tenant to undertake repairs. [The lessee] is obliged to keep the premises in such condition that he can use them *for the purposes for which they are leased*, but he is not obligated to do more." 58 Wis. 2d at 666 (emphasis added). The court explained further that "'a covenant of this kind should not be construed as an affirmative obligation to repair, alter or improve. It is intended only to place upon the lessee rather than the lessor the responsibility for making any such repairs, alterations or improvements which the lessee finds necessary in order to enjoy the use of the premises.'" *Id.* (citing *Puget Investment Co. v. Wenck*, 36 Wash. 2d 817, 831, 221 P.2d 459, 466 (Wash. 1950)). Under *Lindsay Bros.*, not only must the duty to maintain the premises be construed together with the duty to restore the premises at the end of the lease; they must be construed as one and the same duty:

> [The trial judge] properly concluded that, in the absence of any special provisions, the defendant's duty to repair was simply that of maintaining the premises in sufficiently good condition that they could be surrendered in conformity with the termination clause. When a tenant quits the premises in conformity with such a clause, the lessee ipso facto complies with any obligations to make repairs during the term.
>
> [. . .]
>
> [R]epair and termination clauses should be construed together as imposing the same obligation.

58 Wis. 2d at 664–65 (citing *Finnegan v. McGavock*, 230 Wis. 112, 117–118, 283 N.W. 321, 323–24 (1939) (lessee not required to restore elevator that had experienced normal deterioration due to age and weather); *Kanner v. Globe Bottling Co., Inc.*, 78 Cal. Rptr. 25, 29, 273 Cal. App. 2d 559, 565 (Cal. Ct. App. 1969) ("[A] covenant to repair should be reasonably interpreted to avoid placing any unwarranted burden of improvement of the lessor's premises on the lessee."); *Presbyterian Distrib. Serv. v. Chicago Nat'l Bank*, 171 N.E.2d 86, 29, 28 Ill. App. 2d 147, 159 (Ill. App. Ct. 1960) (no liability under repair clause if damage caused by ordinary wear)).

In arguing to the contrary, that the covenant to keep the premises in good repair is separate from the covenant to return the premises in good condition at the end of the lease term, the Owner relies upon the Sixth Circuit case of *Middendorf v. Fuqua Industries, Inc.*, 623 F.2d 13, 18 (6th Cir. 1980). Applying Ohio law, the Sixth Circuit recognized that a number of jurisdictions, including Ohio, construed the two as separate covenants. *Id.* (citing *McKinney v. White Sewing Machine Corp.*, 200 N.E.2d 596, 600 (Ohio App. 1964); *Avelez Hotel Corp. v. Milner Hotels, Inc.*, 227 Miss. 808, 87 So. 2d 63, 65 (1956); *City Hotel Co. v. Aumont Hotel Co.*, 107 S.W.2d 1094, 1095 (Tex. Civ. App. 1937)). However, *Middendorf* is not controlling. As explained above, the Wisconsin Supreme Court rejects this approach and expressly states that the two are to be construed as a single covenant imposing a single obligation. This is consistent with the approach of federal courts applying common law principles as in *Brooklyn Waterfront Terminal*, emphasizing that the two must be construed together rather than separately.

In sum, the repair and maintenance obligations of the parties to a commercial lease are not defined by the repair and maintenance clause alone. Rather, they are deduced from the contract as a whole, with particular attention to the surrender clause. The practical result

9

of interpreting commercial leases in this manner is to impose on commercial tenants the obligation to maintain the premises in such a condition that they can be used for their leased purposes, but no more. *Cf. Warburton v. United States*, 109 F. Supp. 919, 920 (D. Utah 1953) (covenant to "take good care of the Premises" imposed a mandatory obligation to refrain from voluntary waste, but did not impose general repair requirement or require defendant to repair damages caused by reasonable wear and tear); 91 C.J.S. *United States* § 128 (2019) (lease requirement to take good care of premises requires government to keep property in tenantable condition but not to repair generally); 1 Tiffany Real Prop. § 102 (3d ed.) ("A covenant to surrender demised premises in as good a condition as when received is merely *a covenant to repair, that is, not to commit waste*, and when it is coupled with exception of ordinary wear, it states the common law duty to keep the premises windtight and watertight.").

### 1.1.2 Section 7(a)

Turning to this particular lease, the Owner asks me to interpret Section 7(a) as imposing a duty on USPS to maintain the Property in such a condition that it could be rented to another tenant, apparently on similar terms. (Docket # 5 at 27, Docket # 31 at 4, 8.) Under the Owner's interpretation, any failure to repair that would diminish the rental value of the property would render USPS in breach of the lease. While Section 7(a)'s language that USPS shall "keep the [ ] premises in good repair and tenantable condition" is perhaps vague enough to support such a reading, lease provisions are not construed in isolation, as explained above. Instead, USPS's maintenance and repair obligations must be determined from interpreting the contract as a whole. Construed properly, the lease requires only that USPS keep the premises fit for use as a postal facility. The lease cannot reasonably

be interpreted to require USPS to maintain the property in the Owner's ideal state of repair throughout the lease term.

The language obligating USPS to keep the premises "in good repair and tenantable condition" is embedded in a sentence that divides responsibilities between USPS and the Owner:

> The Government shall, *unless herein specified to the contrary*, keep the [ ] premises in good repair and tenantable condition, *except that the Government shall not be obligated to repair the [ ] premises in the event of total or partial damage thereto or destruction thereof caused by fire or other casualty or calamity, Acts of God, acts of the public enemy, or acts of a stranger, the repair of which said damage or destruction shall remain the obligation of the Lessor.*

(Docket # 26-1 at 2 (emphasis added).) Section 7(a) then specifies that the Owner, not USPS, is responsible for certain latent defects, and that USPS has discretion over the timing and manner of maintenance. (*Id.*) In context, this reads more like a clarification of the division of responsibilities than an imposition of an absolute duty to perform any and all repairs. *See Lindsay Bros.,* 58 Wis. 2d at 666 ("A reasonable reading of the repair and replacement clause of the lease reveals that the purpose of the paragraph is the delineation of the responsibilities of the parties during the period of the tenancy."); *Puget Investment Co. v. Wenck*, 36 Wash. 2d at 831 (reading repair covenant not as an affirmative obligation but as a delineation of responsibility).

This reading is consistent with the remainder of Section 7, which further apportions responsibilities for building maintenance and costs. Section 7(b) specifies that USPS will provide maintenance and service for mechanical equipment, but the Owner will remove the equipment when it is worn out. (*Id.* at 3.) Sections 7(c) and 7(d) specify that USPS will pay for heat, custodial services, utilities, and the costs of maintenance of the railroad access easement. (*Id.*) Overall, Section 7 suggests an intent not to impose an absolute repair obligation enforceable by the Owner, but to specify to whom the responsibility for needed

maintenance belongs (USPS) and to whom it does not (the Owner). This is consistent with *Lindsay Bros.*, in which the Wisconsin Supreme Court explained that in a similar commercial lease, "[t]he lessee's obligation for repairs is simply to prevent him from claiming a breach of the lease by the landlord during the term for the failure to make repairs that were the lessee's obligation and not the lessor's." 58 Wis. 2d at 665.

Section 10(a) also suggests that Section 7(a) should not be read in isolation to impose an affirmative obligation to repair. Section 10(a) states that if the premises become "unfit for the purposes leased under circumstances which require the Lessor to repair as provided in paragraph 7 hereof" (for example, destruction by fire), "the Lessor shall put the same in a satisfactory condition for the purposes leased to the satisfaction for the Government." (Docket # 26-1 at 4.) Why would Section 10(a) create an obligation for the Owner to repair if Section 7(a) had already created one by saying that the Owner was responsible for certain repairs? Section 10(a)'s explicit imposition of an obligation to repair suggests that Section 7(a) delineates responsibilities rather than imposes enforceable obligations. *Cf. Praetorian Financial Insurance Co. v. United States of America*, No. C 07-05746 SBA, 2008 WL 2331926, at *7 (N.D. Cal. June 4, 2008) (in lease with relevant language and numbered paragraphs identical to this one, finding that paragraph 7 operates to provide triggering conditions for the duty to repair under 10(a), and otherwise merely exempts from liability to repair).

To any extent that Section 7(a) imposes a duty to maintain and repair on USPS, it must be construed in conjunction with the surrender clause in Section 9. Section 9 states that if the Owner requests it, USPS shall "restore the premises to as good condition as that existing at the time of entering upon the same under this Lease, reasonable and ordinary wear and tear and damages by the elements or by circumstances over which the Government has no control, excepted." (Docket # 26-1 at 3.) As explained above, the

12

limitations in the surrender clause also apply to USPS's maintenance obligations during the lease term. Thus, USPS's maintenance obligations do not include repairs for damage caused by ordinary wear and tear, damages by the elements, or circumstances over which USPS has no control. If such damage must be repaired in order for USPS to continue its operations, Section 7(a) arguably says little more than that USPS cannot require the Owner to repair it.

The practical effect of the Owner's interpretation would be to impose an obligation on USPS to maintain the property perpetually in the same condition as when USPS first leased it, with no allowance for reasonable wear and tear or the effects of age. This defies reason. Section 9 gives USPS sixty days to restore the premises at the end of the lease term and exempts damages from wear and tear and the effects of the elements; Section 7(a) cannot possibly be read to require USPS to maintain the property in a *better* condition during the lease term.

Even if I were to construe Section 7(a) as a stand-alone covenant to maintain and repair, the Owner's interpretation of "good repair and tenantable condition" is unsupported. The phrase was common in postal service leases for decades and, consistent with *Lindsay Bros.*, was interpreted to refer not to rentability or rental value, but to fitness for a particular purpose. In *Penner v. United States Postal Service*, 879 F. Supp. 553 (M.D.N.C. 1995), for example, the USPS lease itself provided the following definition of "good repair and tenantable condition":

> [A] building which is maintained in good repair and tenantable condition is one maintained at a level consistent with comparable buildings and is *fit for the purposes for which it is leased*. In determining the *fitness* of a facility one must consider the reasonable intentions of the parties at the time the lease was entered into, the age and structural character of the leased property, the use to which the property is to be put and the safety and health of those who occupy and use the facility.

> [G]ood repair and tenantable condition is generally, the condition which exists at the beginning of the lease, less ordinary wear and tear, with reasonable maintenance having been performed at the facility *to assure continued fitness for use*, assuming the building was in good condition when accepted.
>
> Good repair and tenantable condition generally does not include repairs or maintenance intended only for aesthetic purposes (e.g., outward appearance of a building or wall), but rather that work *necessary for continued functional use of the facility*. Nor is preventive maintenance, the purpose of which is to prevent or forestall the need for future maintenance or repairs (e.g., seal coating an asphalt surface to avoid future deterioration), included within the definition.

*Id.* at 558. This definition is consistent with the interpretation of the same language in *Brooklyn Waterfront Terminal* and the general interpretation offered by *Lindsay Bros.*

Thus, the lease does not require USPS to keep the Property in a state of perpetual readiness for new tenants. At most, during the lease term USPS must only maintain and repair the Property as necessary to continue using it for postal purposes and refrain from voluntary waste. It need not repair damage caused by ordinary wear and tear, damages by the elements, or circumstances over which it has no control.

    1.2    Breach of the Lease

With a clearer understanding of USPS's maintenance obligations under the lease, I turn to whether the alleged defects might constitute a breach of those obligations. I am cognizant of the procedural posture of this case: the bar is not high to survive a motion to dismiss. *See Windmere Investors Inc. v. United States Postal Service*, No. 06-2265 (KSH), 2007 WL 2509645 (D.N.J. Aug. 30, 2007) (question of whether USPS failed to keep the premises in "good repair and tenantable condition" was factual question inappropriate for motion to dismiss). However, the Owner must allege at least some plausible entitlement to relief, and here, the Owner has not done so.

First, the Owner alleges that a portion of the roof is covered in moss, plants, birds, and bird droppings. (Docket # 26-2 ¶ 20(a).) This appears to be cosmetic in nature, and the lease does not impose a duty to maintain or repair cosmetic issues, at least not unless it can plausibly be said to also affect the building's utility. *Cf. In re Fleming Companies Inc.*, No. 03-10945 (MFW), 2006 WL 2320974 (Bankr. D. Del. Aug. 9, 2006) (applying Wisconsin law and excluding cosmetic issues from covenant to keep premises in "good repair"); *Penner,* 879 F. Supp. at 558 (excluding cosmetic issues from the definition of "good repair and tenantable condition" in postal service lease); *J & R Realty, Inc. v. United States*, 418 F. Supp. 391 393–94 (E.D. Pa. 1976) (painting of lobby and other public areas of post office might be included in duty to keep premises in "good repair and tenantable condition," but not painting of other areas).

The Owner next alleges that safety netting is installed under all exterior concrete coffered ceilings on the first floor and the entire maintenance shop ceiling. (*Id.* ¶ 20(b), (c).) It is unclear how the installation of safety netting could render the premises unfit. The Owner hints that a problem such as falling concrete may necessitate safety netting (Docket # 31 at 4), but the Owner has not actually alleged any falling concrete or other underlying problem, let alone that the building is untenantable. In fact, the reasonable inference is the opposite: that the safety netting allows the building to continue being used.

Next, the Owner alleges that the epoxy coating on the second floor has worn away, allowing water to infiltrate the concrete slab and permitting dripping to the floors below. (*Id.* ¶ 20(d).) The phrase "worn away" suggests that this problem is caused by ordinary wear and tear, and therefore not the responsibility of USPS to repair unless it affects the building's utility. The same is true of the Owner's next allegations, that a ramp displays signs of concrete deterioration (*id.* ¶ 20(e)) and that the seawall is aging and in need of repair (*id.* ¶¶

15

31, 36). On the facts alleged, I can only infer that these defects are caused by the natural deterioration of aging structures, and they are not alleged to significantly impact USPS's operations, if at all. USPS has no obligation under the lease to repair such defects, and therefore cannot have breached the lease. Put another way, the Owner has not plausibly alleged that the defects put the premises out of "good repair and tenantable condition," properly defined. Thus, the Owner's claim that USPS violated its covenant to keep the premises in "good and tenantable condition" fails.

I share the Owner's concern that in evaluating particular alleged maintenance failures we risk venturing too far into summary judgment territory. (Docket # 31 at 3.) I do not think that line has been crossed, but regardless, the Amended Complaint still does not state a claim for breach of contract because Section 7(a) grants USPS discretion over the timing of and manner in which it fulfills its responsibility to maintain and repair the premises. This is logical, given that it is primarily USPS who benefits from the maintenance and repairs during the lease term, or suffers from the lack thereof. While the Owner may be correct that discretion should rarely be left entirely unfettered (Docket # 31 at 5), the Owner has alleged no facts that convince me of an urgent need to override the parties' clear intent to allow USPS to perform repairs on its own timeframe, especially with twenty years potentially left on the lease. The parties could have negotiated an entirely different arrangement, whereby the Owner notified USPS of maintenance defects and gave it a certain time frame during which to cure them. They did not do so. Instead, the parties agreed to give USPS extensive leeway to perform repairs in its own way and at its own pace. Honoring this discretion does not erase USPS's responsibility for maintenance and repairs, as the Owner argues. (Docket # 31 at 4.) It simply prevents the Owner from requiring USPS

to perform specific repairs at a specific time or in a specific way during the lease term, as it attempts to do here.

Because the actions the Owner complains of do not constitute a breach of the lease, properly interpreted, the Amended Complaint fails to state a claim on which relief can be granted. I stress that this outcome is specific to the defects alleged, which appear either cosmetic or the result of natural aging or reasonable wear and tear and do not reasonably appear to affect the building's fitness for its purpose. Because the Amended Complaint does not state a claim for breach of contract, Counts Once, Two, and Three of the complaint will be dismissed without prejudice.

### 2. *Count Four: Implied Covenant of Good Faith and Fair Dealing*

Count Four claims that USPS owed a duty to the Owner under the implied covenant of good faith and fair dealing to provide full information about the condition of the Property so the Owner could determine whether USPS had fulfilled its repair obligations. (Docket # 26 ¶ 69.) The Owner claims that USPS violated and intentionally neglected its duties by withholding pertinent information about the condition of the Property, and that this thwarted the Owner's reasonable expectations under the Lease. (*Id.* ¶¶ 70.)

The duty of good faith and fair dealing is inherent in every contract, including contracts to which the federal government is a party. *Precision Pine & Timber, Inc. v. U.S.*, 596 F.3d 817, 828 (Fed. Cir. 2010) (citing Restatement (Second) of Contracts § 205; *First Nationwide Bank v. United States*, 431 F.3d 1342, 1349 (Fed. Cir. 2005)). The scope of the duty evades precise definition, but the Restatement (Second) of Contracts gives the following overview:

> Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified. But the obligation goes further: bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. A complete catalogue of types of bad

> faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

Sec. 205 cmt.d. Notably, the implied duty of good faith and fair dealing is not a catch-all duty to refrain from misbehavior; it specifically requires a party to honor the other party's rights under the contract. *See Precision Pine & Timber*, 596 F.3d at 829 (citing *First Nationwide Bank*, 431 F.3d at 1350). Wisconsin courts have held that the duty is to refrain from frustrating the purpose of the agreement, *see Estate of Chayka*, 47 Wis. 2d 102, 107, 176 N.W.2d 561, 564 (Wis. 1970) (covenant of good faith breached when party "accomplished exactly what the agreement of the parties sought to prevent"), and from "'arbitrary or unreasonable conduct'," *Foseid v. State Bank*, 197 Wis. 2d 772, 796, 541 N.W.2d 203, 211 (Wis. Ct. App. 1995) (quoting Wis. JI–Civil 3044). The Seventh Circuit has stated that the duty is to refrain from "opportunistic behavior that a mutually dependent, cooperative relationship might enable in the absence of a rule." *Market Street Associates Ltd. Partnership v. Frey*, 941 F.2d 588, 595 (7th Cir. 1991).

USPS argues that the Owner's allegations fail to state a claim because they are unsupported by a single alleged instance of withholding pertinent information, let alone in bad faith. (Docket # 27-1 at 21–22.) In response, the Owner does not disagree, but merely argues that the Court must accept as true its allegation that USPS acted in bad faith by withholding information and preventing the Owner from determining whether USPS fulfilled its repair obligations. (Docket # 31 at 8–9.) On the contrary, the court is not required to accept "legal conclusions and conclusory allegations," *McCauley*, 671 at 616 (citing *Iqbal*, 556 U.S. at 680), which is all the Owner's bare assertions amount to. This is especially so when the Amended Complaint contains allegations that undermine the

Owner's claim, including that USPS allowed the Owner's engineers to inspect the Property and that USPS provided the Owner with an investigation report about the condition of the seawall. (Docket # 26 ¶¶ 30, 32) The Owner has not "identified any contract provision or a contract right that was undermined by USPS's actions." *Jarurn Investors, LLC v. United States*, No. 18-1216C, 2019 WL 3773025, at *7 (Fed. Cl. 2019). In the absence of allegation that USPS deprived the Owner of a right or expectation under the lease separate from the alleged breach of contract, Count Four fails to state a claim for breach of the implied duty of good faith and fair dealing.

### 3. *Declaratory Judgment*

Count Five of the Amended Complaint seeks a declaratory judgment to set forth the rights, status, obligations, and liabilities of the parties pursuant to the lease. (Docket # 26 ¶¶ 73–76.) USPS argues that this count fails to state a claim because it is vague, unclear, and conclusory, and is duplicative of the breach of contract claim. (Docket # 27-1 at 24–28.)

The Declaratory Judgment Act provides: "In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "It is well settled that the federal courts have discretion to decline to hear a declaratory judgment action, even though it is within their jurisdiction." *Tempco. Elec. Heater Corp. v. Omega Engineering, Inc.*, 819 F.2d 746 (7th Cir. 1987) (citations omitted). Accordingly, when a declaratory judgment claim is duplicative of or substantially overlaps with another claim, it is within a court's discretion to dismiss it. *See Cliffs Mining Co. v. Wisconsin Elec. Power Co.*, No. 18-CV-581, 2018 WL 6181470, at *7 (E.D. Wis. Nov. 27, 2018) (collecting cases).

19

In this case, there is significant overlap between the declaratory judgment claim and the breach of contract claim, as both ask the court to determine the scope of USPS's repair obligations under the contract. In response to USPS's challenge, the Owner has failed to indicate any particular benefit of declaratory judgment on this issue separate from its breach of contract claim. (Docket # 31 at 9–10.) Accordingly, I will dismiss the claim.

## CONCLUSION

The Amended Complaint does not state any claim on which relief can be granted and will accordingly be dismissed. The Seventh Circuit instructs that when a complaint is dismissed under Rule 12(b)(6), the general rule is to give at least one opportunity to amend before the entire action is dismissed, unless "it is certain from the face of the complaint that any amendment would be futile or otherwise unwarranted." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 519 (7th Cir. 2015). I do not find this to be one of the rare cases where futility is clear. *See id.* at 520. For these reasons, the Owner will be given leave to file a second Amended Complaint within thirty (30) days of the date of this decision and order.

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendants' motion to dismiss (Docket # 27) is **GRANTED**. The first Amended Complaint (Docket # 26) is **DISMISSED WITHOUT PREJUDICE**. Any second Amended Complaint must be **filed within thirty (30) days** of the date of this decision and order.

Dated at Milwaukee, Wisconsin this 9th day of October, 2019.

BY THE COURT

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge